Filed 9/8/21  P. v. Zubeldia CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JOSE ALONSO ZUBELDIA, Defendant and Appellant. | F081018 (Super. Ct. No. BF176034A) OPINION |

## THE COURT*

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Brad J. Poore, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Nikta Allami, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\* Before Levy, Acting P. J., Franson, J. and Snauffer, J.

Defendant Jose Alonso Zubeldia was convicted of several offenses arising out of a single traffic stop, including driving under the influence of methamphetamine. (Veh. Code, § 23152, subd. (f).) He raises three arguments on appeal. First, he contends there was insufficient evidence he was "under the influence" of methamphetamine at the time he was stopped. Second, he requests this court independently review the sealed in camera record to determine whether the trial court properly denied the discovery he sought in his motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). Third, he claims his abstract of judgment lists a fine imposed under Penal Code section 1202.5[1] that must be stricken because it was not orally pronounced at sentencing and not applicable to any of the offenses of which he was convicted.

We reject his first contention, but his second and third contentions have merit. He is entitled to an independent review of the *Pitchess* materials, and the section 1202.5 fine must be stricken. We order the fine stricken and otherwise affirm the judgment.

## STATEMENT OF THE CASE

The Kern County District Attorney filed an information charging Zubeldia with transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a); count 1), possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 2), possession of ammunition by a prohibited person (§ 30305, subd. (a)(1); count 3), using or being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a); count 4), possession of a device used for injecting or smoking a controlled substance (Health & Saf. Code, § 11364; count 5), and driving under the influence of a drug (Veh. Code, § 23152, subd. (f); count 6).

The information further alleged as to counts 1 through 3 that Zubeldia had suffered a prior strike conviction within the meaning of the Three Strikes law (§§ 667, subds. (c)—(j), 1170.12, subds. (a)—(e)), and that he had served six prior prison terms

---

[1] Subsequent statutory references are to the Penal Code unless otherwise stated.

(§ 667.5, subd. (b)).  However, the People dismissed the prison prior allegations before trial due to a change in the law.

A jury convicted Zubeldia on counts 3, 4, 5, and 6.  The jury acquitted him on count 1 and found him guilty of the lesser included offense of possession of a controlled substance on count 2.  The trial court found the prior strike allegations true as to count 3 in a bifurcated court trial.

The court sentenced Zubeldia to six years in prison on count 3.  The court also imposed concurrent terms of six months on count 2, one year on count 4, and six months on count 5.  The court imposed but stayed a six-month term on count 6 under section 654.

## FACTS

On March 21, 2019, California Highway Patrol Officer Matthew Iturrira was on duty in Oildale in Kern County.  Around 4:00 p.m., he was parked on the side of a two-lane road in a residential area monitoring traffic.  The approximately 40-foot-wide road had one lane going east and one going west.  A double yellow line separated the lanes, and there were houses on the north and south sides of the road.  Traffic was light at the time.

While monitoring traffic, Iturrira noticed a GMC pickup truck approaching him at high speed.  He estimated the truck was traveling at 50 miles per hour in the 25-mile-per-hour zone, and his radar unit confirmed the truck was traveling 50 miles per hour.  Iturrira then watched the pickup cross the double yellow line and pass a car that was traveling 25 miles per hour.  The pickup continued going 50 miles per hour after the pass.  Iturrira activated his lights, drove after the pickup, and made an enforcement stop.  Iturrira did not see the pickup weave at any time, and the pickup pulled over and stopped without issue.

Iturrira approached the pickup's passenger side and saw Zubeldia alone in the truck.  As soon as Iturrira told Zubeldia why he stopped him, Iturrira noticed a glass

3.

smoking pipe with residue in the center console.  Iturrira recognized it as the type of pipe used to smoke methamphetamine, a central nervous system stimulant.

Iturrira observed Zubeldia was "extremely nervous" and "fidgety," his eyes were bloodshot, and he was perspiring.  Zubeldia spoke rapidly but was able to understand and appropriately respond to Iturrira's questions.  Iturrira suspected Zubeldia may be under the influence of a stimulant and asked Zubeldia to step out of the pickup so Iturrira could conduct a DUI investigation.  Zubeldia exited the pickup and moved over to the sidewalk without any difficulty.  Iturrira asked Zubeldia if he had diabetes or epilepsy, which could cause symptoms that mimic drug impairment, and Zubeldia said he did not have those specific medical issues.  Zubeldia did, however, say he suffered from shoulder and ankle pain for which he took pain medication.

Iturrira administered two field sobriety tests to Zubeldia, the horizontal gaze nystagmus (HGN) test and the modified Romberg test.  Iturrira administered the HGN test first and observed Zubeldia's eyes tracked the pen smoothly and there was no horizontal gaze nystagmus in his eyes.  This led Iturrira to rule out the presence of certain categories of drugs such as depressants—including alcohol—inhalants, and PCP.  Iturrira then administered the modified Romberg test.  To perform this test, Zubeldia was asked to stand with his feet together and arms by his sides, tilt his head back, close his eyes, and estimate the passage of 30 seconds.  Zubeldia's eyelids and leg muscles trembled throughout the test, he swayed 1—2 inches, and he estimated 22 seconds as 30 seconds, revealing "a premature internal clock."  The results of this test indicated impairment and were consistent with a central nervous system stimulant.  Also, Zubeldia's tongue was white with large bumps at the rear, and his heart rate was 116 beats per minute.  The

4.

bumps on the tongue were consistent with having smoked methamphetamine and his heart rate was above normal for an average person without a heart condition.[2]

Based on Zubeldia's driving (i.e., driving double the speed limit and the unsafe passing), his demeanor, his performance on the modified Romberg test, his elevated heart rate, and his signs of having smoked a controlled substance, Iturrira concluded Zubeldia was under the influence of a drug and was unable to continue driving safely. Iturrira placed Zubeldia under arrest for driving under the influence and searched Zubeldia and his pickup incident to the arrest. Zubeldia had 23 grams of methamphetamine and a smoking pipe in his pocket. In the pickup were 12 baggies, three non-operational cell phones, and 32 rounds of .22 caliber ammunition.

Zubeldia was taken to a hospital where Iturrira completed a drug recognition evaluation of him. Zubeldia continued to show signs and symptoms consistent with methamphetamine use but stated he had too much shoulder and wrist pain to perform field sobriety tests.

During Iturrira's evaluation, Zubeldia admitted to being a heavy user of and addicted to methamphetamine. He stated that the drugs found in his car were for personal use and that he had taken "a couple of hits" about an hour before Iturrira stopped him. His dilated pupils and pupillary reaction were consistent with being under the influence of a central nervous system stimulant such as methamphetamine. Also, his voice had become raspy, he remained very nervous, his face was flushed and red, he had "rancid" breath, his eyes remained bloodshot, his pulse and blood pressure were elevated, and the muscles in his arms were "very rigid." The raspy voice and rancid breath were consistent with having smoked a controlled substance, while his speech, flushed face, bloodshot

---

[2] Iturrira testified the normal heartrate of a person without a heart condition is 60 to 90 beats per minute.

5.

eyes, very rigid arms, heart rate, and blood pressure were consistent with having used a central nervous system stimulant, specifically methamphetamine.

Zubeldia told Iturrira he had been prescribed and was taking Oxycodone, a narcotic analgesic, for pain. During the drug evaluation at the hospital, Iturrira observed a sign of impairment in Zubeldia's pupils consistent with a narcotic analgesic. However, Iturrira believed the methamphetamine was the predominant drug in Zubeldia's system as far as his symptomology was concerned.

After evaluating Zubeldia at the hospital, Iturrira concluded Zubeldia "was under the influence of a central nervous system stimulant in combination with a narcotic analgesic and was not able to drive safely." His conclusion was based on his observations during the traffic stop, Zubeldia's driving pattern, Zubeldia's demeanor, Zubeldia's admission he had smoked methamphetamine prior to the stop, the drug recognition evaluation administered at the hospital, the elevated heart rate and blood pressure, and the pupillary reaction. Finally, a blood test performed at the hospital screened positive for methamphetamine, but Iturrira never received confirmation of the final result.

At trial, Iturrira testified Zubeldia's passing a car against a double yellow line was "extremely dangerous." He further testified that while it is not unusual for a sober person to speed or make an illegal pass, he "[did not] see a lot of sober people" making that type of pass, although he "guess[ed]" a sober person could attempt such a pass. Iturrira was asked at trial if he determined Zubeldia was driving under the influence solely from his driving pattern, and Iturrira responded, "No. That was simply one of the considerations. It's the totality of everything that I made that determination."

Iturrira also testified regarding how methamphetamine affects an individual's mental function. He stated it is a central nervous system stimulant that "speeds everything up," including the user's thought process, and causes a very nervous demeanor. He explained the drug "impairs a person's ability to drive because their

6.

thought process is sped up." He also stated methamphetamine increases risk-taking behavior and impairs judgment. He further testified Zubeldia's driving pattern, which included the unsafe speed and unsafe passing, was consistent with central nervous system stimulant use as "speeding is very common" in drivers under the influence of stimulants.

## DISCUSSION

### I. Sufficiency of the evidence

Zubeldia contends the evidence was legally insufficient to sustain his conviction for driving under the influence of a drug. (Veh. Code, § 23152, subd. (f).) Specifically, he argues there was insufficient evidence showing he was "under the influence" of methamphetamine when he was pulled over. We disagree.

#### A. Standard of review

In evaluating a sufficiency of the evidence claim, "we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime ... beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, italics omitted.)

7.

" 'Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding.' " (*People v. Lucero* (2019) 41 Cal.App.5th 370, 411.)  Furthermore, we will not reverse "simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

**B.      Law and analysis**

Vehicle Code section 23152, subdivision (f), reads:  "It is unlawful for a person who is under the influence of any drug to drive a vehicle."  To prove a violation of this statute, the People must prove (1) that the defendant drove a vehicle and (2) that, when he or she drove, the defendant was under the influence of a drug.  (CALCRIM No. 2110.)[3] "A person is under the influence if, as a result of taking a drug, his or her mental or physical abilities are so impaired that he or she is no longer able to drive a vehicle with the caution of a sober person, using ordinary care, under similar circumstances." (CALCRIM No. 2110.)

We conclude there was sufficient evidence to support a finding beyond a reasonable doubt Zubeldia was driving "under the influence of a drug," as that term is specially defined in CALCRIM No. 2110, when Iturrira pulled him over.

First, Zubeldia's manner of driving provided evidence of his inability to drive with the caution of a sober person.  Iturrira observed Zubeldia driving 50 miles per hour— more than twice the speed limit—in a residential neighborhood and watched him make an "extremely dangerous" pass against a double yellow line.  Iturrira testified it was a type of pass he "did not see a lot of sober people make," and further explained how it was "very common" for people under the influence of central nervous system stimulants to speed.  We recognize a defendant's manner of driving alone is insufficient to sustain a conviction.  (CALCRIM No. 2110.)  However, "it is a factor to be considered, in light of

---

[3] Zubeldia's jury was instructed on this offense with CALCRIM No. 2110.

8.

all the surrounding circumstances, in deciding whether the person was under the influence." (CALCRIM No. 2110.)

Additionally, Iturrira testified Zubeldia's modified Romberg test results "indicated impairment and were consistent with a central nervous system stimulant." Zubeldia swayed during the test, his legs and eyelids trembled, and he estimated 22 seconds as 30 seconds, demonstrating a premature internal clock. This testimony evidenced that Zubeldia was not just exhibiting symptoms of methamphetamine intoxication, but that he was impaired.

Zubeldia's manner of driving and his modified Romberg test results, considered with Iturrira's other observations and opinions and Zubeldia's admissions, constituted sufficient evidence that Zubeldia's methamphetamine intoxication rendered him unable to drive with the caution of a sober person.

Zubeldia's reliance on *People v. Torres* (2009) 173 Cal.App.4th 977 (*Torres*) is misplaced. In *Torres*, the Court of Appeal reversed the judgment convicting the defendant of driving under the influence. (*Id.* at p. 985.) The appellate court concluded that, while there was legally sufficient evidence to support the conclusion that the defendant was under the influence of methamphetamine when he was arrested, there was no evidence that the defendant's methamphetamine use "actually impaired his driving ability on the night of his arrest." (*Id.* at p. 983.) There was nothing about the defendant's driving that would establish he was under the influence for driving purposes. (*Ibid.*) The defendant was pulled over for failing to stop before the limit line of an intersection, an infraction the officers in that case conceded was neither unusual nor indicative of impaired driving. (*Id.* at pp. 979, 983.) The defendant did not "blow through" the intersection or lock up his brakes and come to a screeching halt, nor was he involved in a near-miss accident. (*Id.* at pp. 979—980.)

Additionally, a toxicologist testified that certain symptoms the defendant exhibited, including sweatiness and an elevated pulse rate, did not render a person an

unsafe driver. (*Torres, supra,* 173 Cal.App.4th at p. 983.) Similarly, while the defendant exhibited muscle rigidity, there was no evidence in the record to correlate that symptom to impaired driving, and, although the jury could have inferred that the defendant's muscle rigidity had the potential to affect his driving ability, it could not infer that it actually did so. (*Id.* at p. 984.) Additionally, while the toxicologist testified that dilated pupils from methamphetamine use could cause momentary blindness while driving, there was no evidence in the record that the defendant experienced such blindness. (*Ibid.*) Further, the defendant was not administered field sobriety tests. (*Id.* at p. 981.)

Here, conversely, there was evidence from which the jury could infer Zubeldia's methamphetamine use impaired his ability to drive. First, Zubeldia was not stopped for a technical violation like failing to stop before a limit line. Rather, he was stopped for going double the speed limit in a residential area and making an "extremely dangerous" pass that Iturrira testified he did not see a lot of sober people make. Second, unlike in *Torres*, there was a lot of evidence correlating Zubeldia's signs and symptoms, including his risk-taking behavior, to his recent methamphetamine use. Additionally, there was evidence that methamphetamine can increase risk-taking behavior, and that it is "very common" for people under the influence of central nervous system stimulants to speed. All of these facts, considered with the other evidence, support an inference Zubeldia's recent ingestion of methamphetamine caused his "extremely dangerous" manner of driving.

Thus, unlike the circumstances in *Torres*, there was substantial evidence here from which the jury could conclude not only that Zubeldia was under the influence of methamphetamine, but also that, as a result, his driving ability was impaired at the time he operated his vehicle to a sufficient degree to support the conviction.

Zubeldia also supports his argument by attempting to demonstrate differences between his case and that of *People v. Benner* (2010) 185 Cal.App.4th 791 (*Benner*). In *Benner*, the Court of Appeal affirmed the defendant's conviction for driving under the

10.

influence of methamphetamine. (*Id.* at p. 796.) In addition to exhibiting signs and symptoms of having ingested methamphetamine, the defendant was unable to perform many of the tasks in the field sobriety tests. (*Ibid.*) She had "glaring deficits in balance, coordination and concentration. And that did not bode well for her driving ability." (*Ibid.*)

The defendant in *Benner* also was "swaying and unsteady," lost her balance during the "walk and turn" test, and failed the "one leg stand" test. (*Benner, supra,* 185 Cal.App.4th at pp. 793—794.) Her eyes did not track smoothly. (*Ibid.*) She was agitated and paranoid and accused the officer of following her all day and suspected his ride-along was an undercover narcotics agent. (*Ibid.*)

It would appear the *Benner* defendant was more severely impaired than Zubeldia, but *Benner* does not purport to describe the minimum level of impairment necessary to support a conviction for driving under the influence of a drug. Instead, we read *Benner* as a useful guidepost or point of reference. *Benner's* analysis does not change our conclusion that sufficient evidence supported a finding Zubeldia was "under the influence of a drug" for purposes of Vehicle Code section 23152, subdivision (f).

## II.     In camera *Pitchess* review

Zubeldia requests we independently review the in camera *Pitchess* proceeding the trial court conducted. The People do not object to our review.

### A.     Background

Prior to trial, Zubeldia filed a *Pitchess* motion seeking disclosure of information concerning Iturrira. The motion sought to discover information contained in his personnel file related to evidence or complaints of: (1) false statements in reports, (2) fabrication of witness testimony in reports, (3) false testimony, (4) falsification of probable cause and/or reasonable suspicion, (5) acts involving moral turpitude, and (6) any other evidence of, or complaints of, dishonesty by Iturrira.

The trial court granted Zubeldia's request for an in camera hearing on July 17, 2019, and conducted an in camera review that day. A court reporter was present during the closed hearing. A custodian of records on behalf of the California Highway Patrol was sworn and testified. The custodian stated it had searched for potentially responsive records pertaining to Zubeldia's *Pitchess* motion. The custodian brought Iturrira's personnel file and two other items to court, and the court reviewed those documents. The court declared no responsive documents existed and denied disclosure. The court asked the custodian to confirm there was nothing in the documents "about dishonesty," and the custodian so confirmed.

On August 17, 2020, we ordered the superior court to augment our record and provide the oral proceedings of the in camera hearing conducted on July 17, 2019, along with the documents that were reviewed and the reporter's transcript.

On October 8, 2020, the sealed records from the superior court pertaining to this *Pitchess* hearing were lodged with this court. Accompanying those documents was the trial court's confidential ruling, which indicated the judge who had presided over Zubeldia's *Pitchess* hearing had reviewed the court reporter's transcript of the in camera hearing and the materials supplied by the custodian of records. The court marked as exhibit 3 the documents the custodian provided. The court determined that, although it had no independent recollection of the in camera hearing, exhibit 3 "appears to be a copy of the personnel file that this court reviewed on July 17, 2019." The court's ruling further stated no other files were reviewed at the in camera hearing.

## B.     The standard of review

" 'A criminal defendant has a limited right to discovery of a peace officer's personnel records. [Citation.] Peace officer personnel records are confidential and can only be discovered pursuant to Evidence Code sections 1043 and 1045.' " (*People v. Yearwood* (2013) 213 Cal.App.4th 161, 180 (*Yearwood*).) "A defendant is entitled to discovery of relevant information from the confidential records upon a showing of good

12.

cause, which exists 'when the defendant shows both " 'materiality' to the subject matter of the pending litigation and a 'reasonable belief' that the agency has the type of information sought." ' " (*Ibid.*)

When the court finds good cause and conducts an in camera review pursuant to *Pitchess*, it must make a record that will permit future appellate review. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229—1230.) A custodian is not required to present to the trial court any documents that are "clearly irrelevant" to the *Pitchess* motion. (*Id.* at p. 1229.) However, if the custodian has any doubt, those documents should be presented to the trial court. (*Ibid.*) "The custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion." (*Ibid.*) A court reporter should memorialize the custodian's statements and any questions asked by the trial court. (*Ibid.*)

### C.    Analysis

We have reviewed the in camera proceeding. The trial court complied with the procedural requirements of a *Pitchess* hearing. A court reporter was present, and the custodian was sworn prior to testifying. (*Yearwood, supra,* 213 Cal.App.4th at p. 180.)

We have reviewed the sealed personnel file. Nothing in these records was subject to disclosure under *Pitchess*. None of the materials were responsive to the information which Zubeldia sought. Based on this record, the superior court properly conducted the *Pitchess* hearing. No documents were discoverable. Accordingly, no error occurred when the court denied any disclosure.

### III.    Section 1202.5 fine

Zubeldia's abstract of judgment states he was ordered to pay a fine of $1,375 under section 1202.5. He contends this fine must be stricken for two reasons: (1) the fine was not orally pronounced at sentencing; and (2) the fine does not apply to any of the

13.

offenses of which he was convicted.  The People concede he is correct for both reasons, and we agree.

First, fines not included in the trial court's oral pronouncement of sentence must be stricken from an abstract of judgment.  " 'Courts may correct clerical errors at any time, and appellate courts ... that have properly assumed jurisdiction [can] order[ ] correction of abstracts of judgment that [do] not accurately reflect the oral judgments of sentencing courts.' [Citation.]  'Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls.' [Citation.]  'If the clerk includes fines in the court's minutes or the abstract of judgment that were not part of the oral pronouncement of sentence, those fines must be stricken from the minutes and the abstract of judgment.' " (*People v. Clark* (2021) 67 Cal.App.5th 248, __ [282 Cal.Rptr.3d 97, 107].)  Second, a fine can only be imposed under section 1202.5 for certain enumerated offenses, and Zubeldia was not convicted of any of the enumerated offenses.  The fine must be stricken from the abstract of judgment.

## DISPOSITION

Zubeldia's section 1202.5 fine is stricken.  The superior court clerk is directed to amend the abstract of judgment accordingly and forward certified copies to the appropriate entities.  The judgment is affirmed in all other respects.

14.